**No. 25-11765**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

OJ COMMERCE, LLC,

*Plaintiff-Appellant,*

v.

NATIONAL CHRISTMAS PRODUCTS, LLC d/b/a NATIONAL TREE COMPANY, NATIONAL CHRISTMAS PRODUCTS INC. d/b/a NATIONAL TREE COMPANY, NATIONAL TREE INTERMEDIARY, LLC, NATIONAL TREE HOLDING, LLC, JOSEPH A PULEO, SALVATORE PULEO, JR., and RICHARD PULEO,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the Southern District of Florida, the Honorable William P. Dimitrouleas*
*Civil Action No. 24-60331*

# PLAINTIFF-APPELLANT'S OPENING BRIEF

Matt Summers
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-1626 (*telephone*)

Shlomo Y. Hecht
SHLOMO Y. HECHT, PA
3076 North Commerce Parkway
Miramar, Florida 33025
(954) 861-0025 (*telephone*)

*Counsel for Plaintiff-Appellant OJ Commerce, LLC*

October 17, 2025

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with 11th Cir. Rule 26.1-1(a), the following is a list of all known trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations with an interest in the outcome of this case or appeal:

1. Berger Montague PC, counsel for Plaintiff-Appellant OJ Commerce, LLC
2. Cohen, Joanna R., counsel for Defendant-Appellee National Christmas Products, LLC
3. Dimitrouleas, Hon. William P., District Court Judge
4. Hecht, Shlomo, counsel for Plaintiff-Appellant OJ Commerce, LLC
5. Horgan, John Brilling, counsel for Defendant-Appellee National Christmas Products, LLC
6. Janjigian, Aldonsa, counsel for Defendant-Appellee National Christmas Products, LLC
7. Johnson, Kyle, counsel for Defendant-Appellee National Christmas Products, LLC
8. National Christmas Products, LLC, Defendant-Appellee
9. OJ Commerce, LLC, Plaintiff-Appellant
10. Summers, Matthew, counsel for Plaintiff-Appellant OJ Commerce, LLC
11. Utanski, Jordan D., counsel for Defendant-Appellee National Christmas Products, LLC

Pursuant to Federal Rule of Appellate Procedure 26.1(a), OJ Commerce, LLC certifies that it is not a publicly held corporation, it has no parent company, and no publicly held company has 10% or greater ownership in it.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted because this appeal presents important and recurring issues concerning the standards for finding anticompetitive effects in antitrust cases as well as specificity and disclosure requirements at the pleading stage.

# TABLE OF CONTENTS

PAGE

Certificate of Interested Persons and Corporate Disclosure Statement ........ i

Statement Regarding Oral Argument ........ iii

Table of Contents ........ iv

Table of Authorities ........ vii

Introduction ........ 1

Statement of Subject-Matter and Appellate Jurisdiction ........ 3

Statement of the Issues ........ 4

Statement of the Case ........ 5

I. The Parties—OJ Commerce and National Christmas Products ........ 5

II. National Christmas Products' Anticompetitive Agreements ("the Agreements") ........ 5

III. OJ Commerce Files the Original Complaint ........ 8

IV. Motion to Dismiss I ........ 8

V. First Amended Complaint ........ 10

VI. Motion to Dismiss II ........ 11

VII. Second Amended Complaint: The Operative Complaint ........ 12

a. The Scheme ........ 12

b. Quantifying Anticompetitive Harm ........ 14

c. Market-Wide Harm ..... 15

d. Supra-competitive Prices ..... 16

e. Suppressed Quality and Consumer Choice ..... 18

f. Motion to Dismiss III: The Dismissal Challenged Here ..... 18

Summary of the Argument ..... 21

Standard Of Review ..... 23

Argument ..... 25

I. The District Court Applied the Wrong Standards for Evaluating Anticompetitive Effects ..... 25

a. The standard for showing actual anticompetitive effects ..... 25

b. The standard for potential anticompetitive effects ..... 26

c. The district court conflated the two standards ..... 27

II. OJ Commerce Sufficiently Alleged Actual Anticompetitive Effects ..... 32

a. The Complaint alleges specific price increases that constitute actual effects ..... 32

i. The district court missed the allegation of a fifteen percent market-wide price increase ..... 32

ii. The allegation of inflated prices for top-selling products is also sufficient ..... 38

b. The allegations of a double-digit price increase are independently sufficient ..... 40

c. The Complaint properly alleges prices above competitive levels ........ 45

i. Qualitative analysis ........ 47

ii. Benchmark analysis ........ 49

iii. Prices compared to costs and inflation ........ 51

d. OJ Commerce also adequately pleaded non-price harms to the market ........ 55

III. OJ Commerce Sufficiently Pleaded Potential Competitive Harm ........ 57

a. National Christmas Products has market power ........ 58

b. The Agreements threatened competition ........ 61

i. The nature of the Agreements was anticompetitive ........ 62

ii. The market's structure made it vulnerable to anticompetitive harm ........ 65

Conclusion ........ 69

Certificate of Compliance ........ 70

# TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) ........ 51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 42

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*,
953 F.3d 707 (11th Cir. 2020) ........ 54, 55

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 23, 41, 42, 54, 55

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ........ 39

*CCBN.Com, Inc. v. Thomson Fin., Inc.*,
270 F. Supp. 2d 146 (D. Mass. 2003) ........ 65

*Cobb Theatres III, LLC v. AMC Ent. Holdings, Inc.*,
101 F. Supp. 3d 1319 (N.D. Ga. 2015) ........ 57

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
817 F.3d 46 (2d Cir. 2016) ........ 41

*Copeland v. Energizer Holdings, Inc.*,
716 F. Supp. 3d 749 (N.D. Cal. 2024) ........ 43

*DeCurtis LLC v. Carnival Corp.*,
2021 WL 7539904 (S.D. Fla. Feb. 9, 2021) ........ 38, 45

*Diverse Power, Inc. v. City of LaGrange, Ga.*,
934 F.3d 1270 (11th Cir. 2019) ........ 42

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) .......... 59

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
360 F. Supp. 2d 465 (E.D.N.Y. 2005) .......... 50

*E&L Consulting, Ltd. v. Doman Indus. Ltd.*,
472 F.3d 23 (2d Cir. 2006) .......... 50

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .......... 40

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .......... 45, 64

*Fed. Trade Comm'n v. Advocate Health Care Network*,
841 F.3d 460 (7th Cir. 2016) .......... 42

*Fed. Trade Comm'n v. Facebook, Inc.*,
560 F. Supp. 3d 1 (D.D.C. 2021) .......... 47

*Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) .......... 39

*Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA*,
341 F. Supp. 3d 27 (D.D.C. 2018) .......... 39, 40

*Hamilton v. Palm*,
621 F.3d 816 (8th Cir. 2010) .......... 54

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
730 F.2d 64 (2d Cir. 1984) .......... 60

*In re Blood Reagents Antitrust Litig.*,
266 F. Supp. 3d 750 (E.D. Pa. 2017) .......... 34

*In re Fla. Cement & Concrete Antitrust Litig.*,
746 F. Supp. 2d 1291 (S.D. Fla. 2010) .......... 67

*In re Jan. 2021 Short Squeeze Trading Litig.*,
105 F.4th 1346 (11th Cir. 2024)........................................................55

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................50

*In re Pool Prods. Distribution Mkt. Antitrust Litig.*,
940 F. Supp. 2d 367 (E.D. La. 2013)........................................59, 60

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ............................................................35

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) ..........................................................................48

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
626 F.3d 1327 (11th Cir. 2010)
.........................................26, 29, 31, 32, 36,37, 38, 39, 41, 45, 53, 54

*Klein v. Facebook, Inc.*,
580 F. Supp. 3d 743 (N.D. Cal. 2022) ..............................................47

*Leegin Creative Leather Products v. PSKS, Inc.*,
551 U.S. 877 (2007) ...................................................................63, 64

*Leonard v. Ala. State Bd. of Pharmacy*,
591 F. Supp. 3d 1155 (M.D. Ala. 2022)...............................46, 54, 55

*Leonard v. Ala. State Bd. of Pharmacy*,
61 F.4th 902 (11th Cir. 2023)..........................................................46

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir. 1996) ...............25, 27, 30, 31, 52, 53, 54, 58

*Lifewatch Servs. Inc. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018)............................................................43

*Lucasys, Inc. v. PowerPlan, Inc.*,
576 F. Supp. 3d. 1331 (N.D. Ga. 2021) .....................................38, 43

*McGahee v. N. Propane Gas Co.*,
858 F.2d 1487 (11th Cir. 1988) .......... 58, 59

*McWane, Inc. v. Fed. Trade Comm'n*,
783 F.3d 814 (11th Cir. 2015) .......... 26, 27, 51, 53, 58

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .......... 35

*MLW Media LLC v. World Wrestling Ent., Inc.*,
655 F. Supp. 3d 946 (N.D. Cal. 2023) .......... 47

*Nat'l Christmas Prods., Inc. v. OJ Com., LLC*,
2023 WL 6534432 (S.D. Fla. Jan. 13, 2023) .......... 6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984) .......... 45

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .......... 26, 27, 29, 37, 40, 46

*OJ Com., LLC v. Nat'l Christmas Prods., LLC*,
No. 24-60331-CIV-WPD (S.D. Fla.) .......... 3

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .......... 50

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
993 F.3d 774 (9th Cir. 2021) .......... 49

*PepsiCo, Inc. v. Coco-Cola Co.*,
315 F.3d 101 (2d. Cir. 2002) .......... 39

*Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*,
711 F.2d 989 (11th Cir. 1983) .......... 23, 24, 40

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
899 F.2d 951 (10th Cir. 1990) .......... 60

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ........................................................ 67

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
376 F.3d 1065 (11th Cir. 2004)
.... 23, 24, 26, 27, 28, 29, 30, 32, 37, 38, 40, 41, 45, 57, 58, 61, 62, 65

*St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*,
795 F.2d 948 (11th Cir. 1986) ........................................................ 24

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)........................................................... 44

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998)........................................... 27, 29, 58, 62

*Toys "R" Us, Inc. v. Fed. Trade Comm'n*,
221 F.3d 928 (7th Cir. 2000) ........................................................ 59

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C.) ........................................................ 56

*United States v. Anthem, Inc.*,
855 F.3d 345 (D.C. Cir. 2017) ........................................................ 56

*United States v. Charlotte-Mecklenburg Hosp. Auth.*,
248 F. Supp. 3d 720 (W.D.N.C. 2017)............................................. 57

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969) ....................................................................... 35

*United States v. Employing Plasterers Ass'n of Chi.*,
347 U.S. 186 (1954) ....................................................................... 40

*United States v. Google LLC*,
778 F. Supp. 3d 797 (E.D. Va. 2025) ............................................. 67

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) .................................................. 42

*United States v. Phila. Nat'l Bank*,
374 U.S. 321 (1963) .......... 59

*United States v. Phillipsburg Nat'l Bank & Tr. Co.*,
399 U.S. 350 (1970) .......... 56

*United States v. Visa, Inc.*,
2025 WL 1740613 (S.D.N.Y. June 23, 2025) .......... 65

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
484 U.S. 977 (1987) .......... 59

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
822 F.2d 656 (7th Cir. 1987) .......... 59

*Vasquez v. Ind. Univ. Health, Inc.*,
40 F.4th 582 (7th Cir. 2022) .......... 44

*Wacker v. JP Morgan Chase & Co*,
678 F. App'x 27 (2d Cir. 2017) .......... 43

*Williamson Oil Co. v. Philip Morris USA*,
346 F.3d 1287 (11th Cir. 2003) .......... 34

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*,
89 F.4th 430 (3d Cir. 2023) .......... 58

*Zenith Radio Corp. v. Hazeltine Rsch.*,
395 U.S. 100 (1969) .......... 48

*Zulily, LLC v. Amazon.com, Inc.*,
761 F. Supp. 3d 1368 (W.D. Wash. 2024) .......... 43

# INTRODUCTION

The district court made a straightforward error that this appeal seeks to correct. The court dismissed Plaintiff's antitrust claims based on the notion that Plaintiff never alleged anticompetitive price increases in the market as a whole. But the district court only reached that conclusion because it missed the numerous places where Plaintiff alleged precisely that. Those allegations are exemplified by paragraph 91 of the operative complaint. Paragraph 91 alleges: "Defendants' illegal agreements with Amazon resulted in supra-competitive, artificially inflated prices for artificial Christmas tree products, as evidenced by a Market-wide price increase of over 15%." Second Amended Complaint ("Complaint" or "Compl.") ¶ 91. The district court did not criticize this allegation or hold that it was conclusory—it simply overlooked it. It also neglected many other allegations, supported by economic analysis, that market-wide prices were driven above competitive levels by the challenged conduct.

For the allegations the district court did grapple with, it applied the wrong legal standards for finding both actual and potential anticompetitive effects. The court blended the two standards together and ended up applying an amalgamated, heightened standard for both.

When evaluating potential anticompetitive effects, the court erroneously required a showing of actual effects too. And when evaluating actual effects, the court applied a summary-judgment-like standard that would fundamentally transform the pleading stage.

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The district court had federal subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337(a). The district court had supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Venue was proper in the district court under 15 U.S.C. § 22 based on Defendant's transactions in the Southern District of Florida.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a)(1)(A). On April 25, 2025, the district court granted Defendant's motion to dismiss. MTD Order III at 19. Plaintiff-Appellant filed a timely notice of appeal on May 23, 2025. Notice of Appeal, *OJ Com., LLC v. Nat'l Christmas Prods., LLC*, No. 24-60331-CIV-WPD (S.D. Fla. May 23, 2025).

## STATEMENT OF THE ISSUES

1. Did the district court err by applying the wrong standards for evaluating anticompetitive effects?

2. Did the district court fail to appropriately credit actual effects on competition by missing key allegations and holding others to a summary-judgment-like standard?

3. Did the district court err in failing to properly evaluate allegations of potential anticompetitive effects (by requiring a showing of actual anticompetitive effects as well)?

# STATEMENT OF THE CASE

## I. The Parties—OJ Commerce and National Christmas Products

OJ Commerce, LLC is a prominent online retailer that sells a broad range of goods to U.S. consumers. Compl. ¶ 1. Consumers can visit OJ Commerce's website and order an array of products. *See id.* OJ Commerce is a Delaware company based in Florida. *Id.* ¶ 1.

National Christmas Products, LLC is a wholesaler that manufactures and sells artificial Christmas trees. *Id.* ¶¶ 12, 36, 38. It is "by far the largest" artificial Christmas tree manufacturer. *Id.* ¶ 44. It controls at least a 50% market share—the remainder is comprised of a limited number of much smaller companies. *Id.* National Christmas Products is a Delaware corporation based in New Jersey. *Id.* ¶ 2.

## II. National Christmas Products' Anticompetitive Agreements ("the Agreements")

OJ Commerce and National Christmas Products did business together for years. *Id.* ¶¶ 13, 18, 151. In 2017, OJ Commerce bought artificial trees from a precursor of National Christmas Products and sold them to consumers. *Id.* ¶¶ 13, 151. This relationship continued through 2021. *Id.* ¶ 18. But in 2022, National Christmas Products and OJ Commerce sued one another over a contract dispute. MTD Order I at 1;

*Nat'l Christmas Prods., Inc. v. OJ Com., LLC*, 2023 WL 6534432 at *1 (S.D. Fla. Jan. 13, 2023).

Through the litigation, OJ Commerce discovered that National Christmas Products was engaged in an anticompetitive scheme. During discovery, National Christmas Products revealed several anticompetitive contracts with Amazon—the largest U.S. e-commerce retailer—that harmed OJ Commerce. Compl. ¶¶ 43, 59–60. Those contracts are the subject of this lawsuit.

National Christmas Products' contracts with Amazon constituted a series of anticompetitive vertical price fixing agreements. Vertical agreements are agreements between companies at different levels of the supply chain, such as between a manufacturer and a retailer. Amazon is a retailer that sells many of the goods National Christmas Products manufactures.

First, National Christmas Products and Amazon agreed to "fix[] the prices that [National Christmas Products] would charge to online retailers other than Amazon[.]" *Id.* ¶ 39. This ensured that Amazon's competitors in the retail space—including OJ Commerce and others—could not buy National Christmas Products' artificial Christmas trees for

less than a fixed, inflated price. The Complaint refers to this as the "minimum margin agreement." *Id.*

Second, National Christmas Products and Amazon agreed to various "product restraint agreements." The product restraint agreements prevented non-Amazon retailers from discounting National Christmas Products goods and precluded them from carrying certain products altogether. *Id.* at 1–2, ¶¶ 39–40. The minimum margin and product restraint agreements adopted a de facto price floor by effectively "prevent[ing] other online retailers, such as OJ [Commerce], from offering the same artificial Christmas tree products Amazon sells at lower prices." *Id.* ¶ 52. These are also vertical price fixing agreements.

National Christmas Products aggressively enforced the Agreements. *Id.* ¶¶ 53, 64–70, 89–90. It required other retailers (like OJ Commerce) to adhere to its Agreements and worked with Amazon to identify and punish violators. National Christmas Products demanded that OJ Commerce abide by its minimum pricing policies. *Id.* ¶¶ 64–70. This meant OJ Commerce could not offer lower priced trees than Amazon was selling. National Christmas Products and Amazon enlisted an enforcer firm—OrcaPacific—to scour the internet, identify discounting

retailers, and levy harsh punishments. *Id.* ¶¶ 53, 70, 89–90. As part of this enforcement scheme, OrcaPacific identified OJ Commerce as a discounter. *Id.* ¶¶ 70, 89–90. National Christmas Products punished OJ Commerce by cutting it off from future supplies of its products. *Id.*

### III. OJ Commerce Files the Original Complaint

OJ Commerce brought the instant action against National Christmas Products (and other related entities that have since been dismissed) under federal and state antitrust laws. Original Compl. ¶ 76; MTD Order I at 2. In the Original Complaint, OJ Commerce detailed the anticompetitive minimum margin and product restraint agreements between National Christmas Products and Amazon. Original Compl. ¶¶ 21–22. The Original Complaint cited to emails and deposition testimony about the vertical agreements. *Id.* Exhibits A–D. The Original Complaint alleged that the Agreements "violate[d] Section 1 of the Sherman Act's prohibition against price-fixing by setting a de facto minimum retail price." *Id.* ¶ 26.

### IV. Motion to Dismiss I

National Christmas Products moved to dismiss the Original Complaint. MTD Order I at 4. The district court analyzed the deposition

testimony attached to the Original Complaint, in which a National Christmas Products executive admitted to "enforcing" minimum price requirements in response to "Amazon complaining about other dropshippers undercutting the price." *Id.* The court found that OJ Commerce sufficiently alleged antitrust standing by detailing anticompetitive restraints that targeted OJ Commerce. *Id.* at 5, 9, 10. The district court also found that OJ Commerce sufficiently alleged evidence of the Agreements. *Id.* at 7.

Nonetheless, the district court held that OJ Commerce failed to state a claim under Section 1 of the Sherman Act. The court held that OJ Commerce failed to sufficiently allege that (1) "consumers could not purchase artificial Christmas trees at a lower price from other retailers," (2) that "Plaintiff could not simply have conducted business with a different manufacturer and thereby secure lower costs," and (3) that Defendant "had market power, such that either [OJ Commerce] or consumers could not easily purchase a lower cost product." *Id.* at 8. Accordingly, the district court dismissed the Original Complaint, but granted OJ Commerce leave to amend. MTD Order I at 9–10.

## V. First Amended Complaint

OJ Commerce filed its First Amended Complaint ("FAC"), directly addressing the district court's concerns and strengthening the allegations. OJ Commerce alleged that National Christmas Products possessed "at least 50%" market share in the relevant market. FAC ¶ 30. And OJ Commerce explained why retailers and consumers were prevented from turning elsewhere for artificial Christmas products. *Id.* ¶ 33. OJ Commerce detailed the range of barriers to entry in the market that prevented other manufacturers from stepping in to inject competition. *Id.* ¶ 31–32. The First Amended Complaint alleged that OJ Commerce could not "simply conduct[] business with a competitor of" National Christmas Products because of its market power and the market structure. *Id.* ¶¶ 33, 35, 62, 77–78.

OJ Commerce explained that the anticompetitive Agreements "restricted consumers' ability to shop around." *Id.* ¶ 60. Consumers "could not purchase less expensive options from other competing online retailers, because no retailers were allowed to sell Defendants' products for less than Amazon." *Id.* The First Amended Complaint alleged that the Agreements forced consumers to pay higher prices. *Id.* ¶ 42. OJ

Commerce supported this allegation with empirical analysis, calculating "that after March 2020—*after* the product restraint agreements were entered into—the prices to consumers for top-selling artificial Christmas tree products" increased. *Id.* ¶ 58. The First Amended Complaint showed that the Agreements locked up the market such that OJ Commerce and consumers could not avoid the anticompetitive conduct by switching to a lower-cost retailer.

## VI. Motion to Dismiss II

The district court dismissed the First Amended Complaint on the grounds that it insufficiently alleged anticompetitive effects. MTD Order II at 14–15. First, the district court held that OJ Commerce had not alleged that the elevated prices were necessarily inflated above competitive levels. *Id.* at 15. Second, the district court held that the alleged price increases could have been caused by other factors, such as the "pandemic and overall inflation in the market." *Id.* Third, the district court held that the price increase among top-selling products did not necessarily mean that prices increased in the entire defined market. *Id.* The court again dismissed the claims without prejudice.

### VII. Second Amended Complaint: The Operative Complaint

OJ Commerce's Second Amended Complaint is at issue in this appeal. It provided substantially more empirical evidence about the anticompetitive effects of the challenged conduct. *See, e.g.*, Compl. ¶¶ 44, 78–79, 81–88, 91. The Complaint alleged detailed quantitative analyses using publicly available data. *Id.* ¶¶ 83, 85. Based on these allegations, OJ Commerce alleged violations of Section 1 of the Sherman Act as well as several states' antitrust laws. *Id.* ¶¶ 124–49.

#### a. The Scheme

The Complaint explains National Christmas Products' scheme in exhaustive detail, supported by testimony of Defendant's own executives. The Complaint outlines the minimum margin agreement and the product restraint agreements detailed above. These Agreements fixed the prices National Christmas Products offered to non-Amazon retailers, limited the products that non-Amazon retailers could sell, and required non-Amazon retailers to abide by a price floor. Compl. at 1–2, ¶¶ 39–40. OJ Commerce alleges that each agreement violates the antitrust laws.

OJ Commerce then explains that National Christmas Products enforced these anticompetitive Agreements by cutting off retailers that

discounted prices. *Id.* ¶¶ 53, 67–70. The Agreements thus "prevented" OJ Commerce from undercutting Amazon's pricing or otherwise providing discounts for the benefit of the consumer because OJ Commerce "faced being cut off from inventory and sales by" National Christmas Products. *Id.* ¶ 58. National Christmas Products committed fully to the scheme, agreeing to compensate Amazon if its customers sold products below the price floor. *Id.* ¶ 54.

The Complaint also outlines the aims of the scheme. Amazon, the "dominant retailer in the Market," wanted to "eliminate price competition" and "forestall innovation in distribution" systems that could threaten its dominance. *Id.* at 1, ¶¶ 35, 41–44, 55, 93. The Agreements "mirror Amazon's broader strategy of coercing suppliers into exclusive arrangements to exclude rival retailers." *Id.* ¶¶ 56, 91. National Christmas Products—the dominant manufacturer—agreed to the scheme to maximize its own profits. It wanted to cement "access to [Amazon's] distribution network," so it restricted sales and enforced the Agreements. *Id.* ¶¶ 35, 39–40, 54. The scheme fixed the price National Christmas Products charged to non-Amazon retailers and prevented retailers from offering discounted products to consumers. *Id.*

The Complaint demonstrates why the Agreements harmed OJ Commerce, consumers, and competition. The Agreements prevented "[r]etailers with better distribution systems and lower cost structures," like OJ Commerce, from offering discounted prices. *Id.* ¶¶ 35–36, 51. OJ Commerce lost profitable sales it could have otherwise made. *Id.* ¶¶ 58, 95. OJ Commerce could not simply "conduct[] business with a competitor," or sell alternative Christmas products, because of Defendant's market power, lack of substitutes, and inelasticity of demand. *Id.* ¶¶ 45, 47, 96, 111-12. By restraining competitors and removing pricing pressure, National Christmas Products and Amazon raised prices higher than they could have in a competitive market. *Id.* ¶¶ 35–36, 54, 73 122(a), 122(c). Consumers paid higher prices because they could not "shop around" or obtain lower prices. *Id.* ¶¶ 73, 93

**b. Quantifying Anticompetitive Harm**

The Complaint alleges an empirical analysis of the Agreements' effects. The Complaint concludes that the illegal Agreements "resulted in supra-competitive, artificially inflated prices for artificial Christmas tree products, as evidenced by a [m]arket-wide price increase of over 15%." *Id.* ¶ 91. Consistent with this calculation, OJ Commerce also alleged that

retail prices "in the Market substantially increased above competitive levels by double digits." *Id.* ¶ 78. The Complaint further alleges that, as economic theory would predict, "the top-selling artificial Christmas tree products" experienced the same price increase as the market as a whole—"more than 15%[.]" *Id.* ¶ 79.

OJ Commerce's allegations and economic analysis align with the Federal Trade Commission's findings "that Amazon's anticompetitive practices broadly impose inflated prices on U.S. consumers, depriving them of the benefits of a free and open market." *Id.* ¶ 91; *see also id.* ¶ 56.

**c. Market-Wide Harm**

The Complaint identifies substantial price increases in the entire market, not just for top selling products. The Complaint defines the capitalized term "Market" as: "online sales in the artificial Christmas tree product category, within the geographic scope of the United States." *Id.* ¶ 37. In numerous paragraphs, the Complaint alleges that a rigorous economic analysis showed a substantial price increase in the market as a whole. *See, e.g.*, *id.* ¶¶ 78, 87. For example, the allegation of a 15% price increase in paragraph 91 is "a Market-wide price increase." *Id.* ¶ 91. Paragraph 78 similarly alleges double digit price increases "in the

Market." *Id.* ¶ 78. And Paragraph 87 alleges that there were "price fixing increases throughout the Market." *Id.* ¶ 87. Numerous other paragraphs reinforce this point. *See, e.g., id.* ¶ 122(d) ("increasing the retail price of artificial Christmas trees within the Market to consumers."). The Complaint also alleges a 15% price increase among *top-selling* artificial Christmas tree products, but the same sentence makes clear that this increase is alleged "[i]n addition to the anticompetitive, double-digit increase in prices *across* the entire Market." *Id.* ¶ 79.

**d. Supra-competitive Prices**

The Complaint's allegations illustrate that prices did not merely rise—they specifically rose above the competitive level. Prices are elevated above competitive levels when they are higher than they would be in a competitive marketplace. The Complaint repeatedly alleges that prices across the market "were above competitive levels," *id.* ¶ 86, "substantially increased above competitive levels," *id.* ¶ 78, and "resulted in supra-competitive, artificially inflated prices[.]" *Id.* ¶ 91. The Complaint shows that Defendant's "anticompetitive conduct alone drove these increases," rather than the normal competitive process. *Id.* ¶ 88.

The Complaint analyzes overall market data to ensure that the price increases were caused by anticompetitive conduct rather than external factors. The Complaint squarely rules out the pandemic and overall inflation in the market as potential causes of the relevant price increases. In the relevant period in 2020, the pandemic was exerting a "downward pressure" on prices. *Id.* at 18 n.8. OJ Commerce analyzed data from the Bureau of Labor Statistics and found that "the price of overall consumer goods *decreased* by 0.4% during that same time frame." Compl. ¶ 83 & n.8. News and government sources confirm that consumer prices at the time experienced "the largest decline in five years." *Id.* ¶¶ 81–88 & n.8, n.9. Because prices for artificial Christmas trees rose as inflation fell, inflation could not have been the cause of the price increases. Although inflation (and prices) rose later in the pandemic, the Complaint shows that the "price fixing increases throughout the Market appeared *a year before* the COVID pandemic began to drive up inflation." *Id.* ¶ 87 (emphasis in original).

The Complaint also ruled out other potential drivers of the price increases, such as elevated wholesale prices. The Complaint alleges that the price increases "hit only retail prices—what consumers paid—while

wholesale costs to Defendants didn't budge." *Id.* ¶ 88. After ruling out other possible causes, the Complaint concludes that the "price increases were driven exclusively" by "Defendants' active enforcement of its" anticompetitive Agreements, "not by external economic conditions." *Id.* ¶¶ 81, 88–89.

#### e. Suppressed Quality and Consumer Choice

The Complaint also alleges non-price harms across the market, observing that the anticompetitive Agreements "restricted U.S. consumers' level of service in the Market." *Id.* at 94; *see also id.* ¶ 120. Beyond "rais[ing] retail prices significantly for consumers," these Agreements also "cut the consumer's buying options, cut service levels, strangled competition of retailers like [OJ Commerce] in favor of Amazon, and limited distribution." *Id.* ¶ 75.

#### f. Motion to Dismiss III: The Dismissal Challenged Here

The district court dismissed the complaint for a third time, this time with prejudice. The court found OJ Commerce had met its burden to define a relevant market and allege that National Christmas Products and Amazon had an express agreement that could harm competition in violation of the antitrust laws. MTD Order III at 4, 17–18. The court

correctly assumed that a 50% market share alongside other considerations is sufficient to allege market power. *Id.* at 18.

But the district court held that OJ Commerce had still failed to allege that National Christmas Products' actions had an anticompetitive effect on the market. *Id.* at 17–19. The court found that OJ Commerce failed to adequately allege anticompetitive harm by analyzing two of its allegations in isolation.

First, it addressed the Complaint's allegation that there was a price increase in *top-selling* products. The district court found, as it had in the second motion to dismiss, that this allegation did not show a market-wide price increase. MTD Order II at 15; MTD Order III at 17. Specifically, the district court held that the allegation about top-selling products "[could] be disregarded" because the Complaint "does not allege that such an increase *occurred in the defined market*." MTD Order III at 17 (emphasis in original). It also criticized OJ Commerce for not providing a complete "explanation of how Plaintiff arrived" at its numerical findings. *Id.*

Second, the district court analyzed OJ Commerce's allegation that there were double-digit price increases market wide. *Id.* at 18. The court found that this allegation "lack[s] numerical specificity." *Id.* The court

also held that Plaintiff did not allege a *supra-competitive* price increase. *Id.*

The order did not cite paragraph 91, which specifically alleged that the Agreements "resulted in supra-competitive, artificially inflated prices for artificial Christmas tree products, as evidenced by a Market-wide price increase of over 15%." Compl. ¶ 91. The court also did not meaningfully engage with numerous allegations that the Agreements led to market-wide increases above competitive levels. *See, e.g.,* Compl. ¶ 86 ("[T]he increase in retail prices of artificial Christmas tree products in the Market as a result of the illegal agreements showed the prices were above competitive levels").

## SUMMARY OF THE ARGUMENT

The district court erred in holding that OJ Commerce failed to plausibly allege anticompetitive effects. The district court misconstrued this Court's well-established standard for assessing harms to competition. And it did not properly grapple with the facts of this case—missing key allegations and holding others to a summary-judgment-like standard.

*First*, the district court applied the incorrect standard for evaluating anticompetitive effects. There are two independently sufficient ways to show anticompetitive effects in an antitrust case—actual effects or potential effects. The district court combined the standards into one amalgamated, heightened standard. That was error.

*Second*, the district court failed to properly credit the allegations of actual anticompetitive effects. It did so first by flatly missing a key allegation. The court held that OJ Commerce never alleged a specific percentage price increase in the market as a whole. But OJ Commerce made precisely that allegation. Next, the court found allegations of "double-digit" price increases to be insufficiently specific, but nothing more is not required at the pleading stage before discovery. The court

also found that OJ Commerce failed to allege price increases above the competitive level. But that conspicuously ignores numerous allegations where the complaint provides a detailed economic analysis proving that prices increased to supra-competitive levels. Finally, the court missed other grounds for finding actual anticompetitive effects.

*Third,* the district court erred by failing to accept OJ Commerce's allegations of potential anticompetitive effects. OJ Commerce adequately alleged potential anticompetitive effects in the relevant market by establishing market power and showing that the structure of the interbrand market was such that it was vulnerable to anticompetitive harm. These allegations are on firm ground under Supreme Court precedent, which has opined on the precise type of anticompetitive arrangement alleged in this case.

## STANDARD OF REVIEW

This Court reviews a grant of a motion to dismiss under Rule 12(b)(6) for failure to state a claim *de novo*, resolving all disputes and drawing all inferences in favor of the non-moving party. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).

The complaint simply needs to contain "enough facts to state a claim to relief that is plausible on its face," assuming the truth of the allegations and making all reasonable inferences in favor of the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Spanish Broad.*, 376 F.3d at 1070. To be plausible, the complaint must contain more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

"[A]ntitrust plaintiffs must allege facts in support of each element of an antitrust violation," but "the alleged facts need not be spelled out with exactitude." *Spanish Broad.*, 376 F.3d at 1077–78 (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.,* 711 F.2d 989, 995 (11th Cir. 1983)). A "complaint should only be dismissed with prejudice if it appears *beyond doubt* that [the plaintiff] can prove no

set of facts which would entitle it to relief." *Id.* (citing *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948, 953 (11th Cir. 1986)) (emphasis added). "Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases" because discovery is needed to develop the factual basis for the claim. *Spanish Broad.*, 376 F.3d at 1070.

## ARGUMENT

This appeal centers on one question: whether OJ Commerce adequately pleaded anticompetitive effects. Under Eleventh Circuit and Supreme Court precedent, there are two ways of showing anticompetitive effects. A "plaintiff may either prove that the defendants' behavior had an 'actual detrimental effect' on competition, or that the behavior had 'the potential for genuine adverse effects on competition.'" *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996). Either suffices. OJ Commerce showed *both* actual and potential harms to competition.

### I. The District Court Applied the Wrong Standards for Evaluating Anticompetitive Effects

The district court combined the requirements for alleging actual and potential anticompetitive effects. In doing so, it applied one blended, heightened standard. That was error.

#### a. The standard for showing actual anticompetitive effects

To demonstrate actual anticompetitive effects, a plaintiff must show some observable effect on competition from the challenged conduct. A plaintiff can show actual anticompetitive effects via "specific damage done to consumers," such as "actually caus[ing] consumers to pay higher

prices." *Spanish Broad.*, 376 F.3d at 1072 (internal citations omitted). Any injury to competition suffices, including elevated prices, suppressed output, or depressed quality. *Spanish Broad.*, 376 F.3d at 1072; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010); *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018).

Actual anticompetitive effects are differentiated from potential anticompetitive effects by the type of evidence used to demonstrate them. Rather than discuss "actual anticompetitive effects" as such, some recent opinions from the Supreme Court and this Court refer to *direct evidence* of anticompetitive effects instead. *Am. Express Co.*, 585 U.S. at 542; *McWane, Inc. v. Fed. Trade Comm'n*, 783 F.3d 814, 835, 838, 839 (11th Cir. 2015).

**b. The standard for potential anticompetitive effects**

To show potential harm to competition, a plaintiff "must show [1] market power, [2] plus some other ground for believing that the challenged behavior could harm competition in the market, such as [i] the inherent anticompetitive nature of the defendant's behavior or [ii] the structure of the interbrand market." *Spanish Broad.*, 376 F.3d at 1073

(quoting *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 97 (2d Cir. 1998)).

Potential anticompetitive effects are not distinguished from actual effects by the type of harm caused or when that harm occurs. *See Am. Express Co.*, 585 U.S. at 542. Potential anticompetitive effects are distinguished by the fact that a plaintiff can show them with circumstantial or indirect evidence. Circumstantial evidence can show that the conduct at issue likely harmed competition. Antitrust "analysis is concerned with the actual or likely effects of defendants' behavior." *Levine*, 72 F.3d at 1552; *McWane,* 783 F.3d at 836 (this Court often looks to "probable effect" of anticompetitive conduct, rather than definitive proof of anticompetitive harm). To refer to potential anticompetitive effects, courts often discuss *indirect evidence* of anticompetitive effects. *Am. Express*, 585 U.S. at 542 (citing *Spanish Broad.*, 376 F.3d at 1073); *McWane,* 783 F.3d at 835, 839.

### c. The district court conflated the two standards

The district court's approach collapses the two standards. The district court's opinion initially appears to recognize the distinction between "actual effects or potential effects on competition in the market."

MTD Order III at 17. But the district court then collapses the two into one paragraph that suggests the elements of both are required. The district court scrutinized OJ Commerce's allegations under this heightened unified standard. In doing so, the court contorts this Court's "exceedingly low threshold" for complaints, *Spanish Broad.*, 376 F.3d at 1077, into "a high threshold." MTD Order III at 17 ("These requirements amount to a high threshold.").

The district court's scrutiny of the facts confirms that it erroneously combined the standards for actual and potential effects. The court's analysis demanded OJ Commerce meet an inflated, unified standard for *both* simultaneously. The district court began by identifying the relevant market and assessing whether National Christmas Products possessed market power. MTD Order III at 17–18. That suggests the court was analyzing potential anticompetitive effects because market power is not required for actual anticompetitive effects. To properly analyze potential effects, the district court should next have looked for some other ground for believing that the Agreements could harm competition in the market. *Spanish Broad.*, 376 F.3d at 1073. The court could have considered the

anticompetitive nature of the Agreements, the market structure, or other considerations. *Id.* (quoting *Top Mkts.*, 142 F.3d at 97).

Instead, however, the district court layered the actual effects standard on top of the potential effects standard. It held that OJ Commerce "must also" show that the challenged conduct *actually* "*had* an anticompetitive effect on the market." MTD Order III at 18 (emphasis added). That was in error. Showing proof of an observable anticompetitive effect is only a requirement for showing actual anticompetitive effects. *See Am. Express*, 585 U.S. at 542; *Spanish Broad.*, 376 F.3d at 1072. The court required OJ Commerce to meet the strictures of proving both potential effects and actual effects to proceed under either theory.

In adding the actual effects standard into the potential effects analysis, the district court cited *Spanish Broadcasting*, 376 F.3d at 1071 and *Jacobs*, 626 F.3d at 1339. MTD Order III at 18. Neither case supports its approach. Both cases engaged in a careful, bifurcated analysis of actual and potential effects that the district court here eschewed.

In *Spanish Broadcasting*, this Court began by making clear that the plaintiff could prove "either" actual or potential effects. 376 F.3d at

1072 (quoting *Levine*, 72 F.3d at 1551). First, this Court analyzed actual anticompetitive effects, finding that "None" of the plaintiff's allegations asserted harm to competition and plaintiff instead alleged that competition benefitted. *Id.* ("Indeed, at oral argument before the district court, [the plaintiff] stated that [the defendant] worked to keep Spanish-language advertising rates *lower*.") (emphasis in original).

Second, this Court transitioned to evaluating potential anticompetitive effects: "Concluding that no 'actual damage to competition' has been sufficiently alleged in the plaintiff's amended complaint, we turn to the alternative method for alleging an anticompetitive effect: the 'potential for genuine adverse effects on competition.'" *Id.* at 1073 (quoting *Levine*, 72 F.3d at 1551). In separately evaluating potential effects, this Court discerned whether the plaintiff had alleged market power and "described how the defendants' alleged behavior would be likely to harm competition." *Id.* at 1074. Because the plaintiff made no "specific allegations detailing the threat" to the market, it failed to allege potential effects. *Id.*

*Jacobs* follows the same approach almost beat for beat. It similarly cites *Levine* for the fact that either actual or potential anticompetitive

effects suffice. *Jacobs*, 626 F.3d at 1336 (citing *Levine*, 72 F.3d at 1551). Then it analyzes actual anticompetitive effects, finding the plaintiff's claims wanting. Next, it transitioned to a separate analysis of potential effects: "Because Jacobs did not provide allegations plausibly suggesting actual harm to competition, his only avenue of relief was to sufficiently allege potential harm." *Id.* at 1339. There, this Court assessed the defendant's market power and whether the plaintiff explained how the challenged conduct could harm competition. *Id.* at 1340. This Court held that the plaintiff's "bare legal conclusion" did not allow the court to assess how the conduct harmed competition. *Id.*

Despite this Court's well-established approach to analyzing the sufficiency of anticompetitive effects, the district court went in another direction. It integrated the two analyses into one and required OJ Commerce to meet the requirements for both. Halfway through its analysis of potential anticompetitive effects, the district court lurched to holding that OJ Commerce "must also" show actual anticompetitive effects. MTD Order III at 18. None of this Court's cases endorse such an approach.

## II. OJ Commerce Sufficiently Alleged Actual Anticompetitive Effects

To show actual anticompetitive harm, a plaintiff need only show damage to consumers—such as inflated prices or suppressed quality or output. *Spanish Broad.*, 376 F.3d at 1072; *Jacobs*, 626 F.3d at 1339. Properly construed, OJ Commerce's allegations showed actual anticompetitive harm. In holding to the contrary, the district court made four wrong turns. First, it missed a key allegation—that prices rose 15% above competitive levels market-wide—and under-valued the price allegations it did evaluate. Second, it held allegations of double-digit price increases to an improper standard. Third, it discounted extensive evidence that prices rose above competitive levels. Fourth, it failed to consider non-price evidence of actual effects. Each constitutes reversible error.

### a. The Complaint alleges specific price increases that constitute actual effects

#### *i. The district court missed the allegation of a fifteen percent market-wide price increase*

The district court's entire analysis of the anticompetitive effect allegations is a single paragraph. It focuses narrowly on two allegations in the Complaint, the first of which quantifies a 15% price increase

among top-selling Christmas products. MTD Order III 18–19. The district court held: "The 15% price increase can be disregarded as Plaintiff does not allege that such an increase *occurred in the defined market*—'online sales in the artificial Christmas tree product category, within the geographic scope of the United States'—but only within the 'top selling' Christmas tree market." MTD Order III at 19.

Yet OJ Commerce made the precise allegation the district court held was necessary. The district court just never cited it. *Compare* Compl. ¶ 91 *with* MTD Order III 17–19. Paragraph 91 of the Complaint alleges: "Defendants' illegal agreements with Amazon resulted in supra-competitive, artificially inflated prices for artificial Christmas tree products, as evidenced by a Market-wide price increase of over 15% after March 2020." Compl. ¶ 91. Paragraph 91 thus alleges a 15% price increase "Market-wide" where the "Market" is defined as "online sales in the artificial Christmas tree product category, within the geographic scope of the United States." *Id.*; *see also id.* ¶ 37. Instead of considering paragraph 91, the district court focused narrowly on the allegation of a 15% price increase among top-selling products. MTD Order III at 18. But

it never engaged with Plaintiff's distinct allegation that there was also a 15% price increase in the whole market. *Id.*; Compl. ¶ 91.

The district court should have viewed the 15% increase among top-selling products and the 15% market-wide increase as mutually reinforcing, rather than analyzing one to the exclusion of the other. When anticompetitive conduct inflates prices for a subset of products (in this case, top-selling products) by 15%, antitrust economics expects market-wide prices to increase by the same amount. While companies in competitive markets often undercut price increases, companies in imperfectly competitive markets are incentivized to raise their prices to profit from market distortions. *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003) ("[T]here may be a "rational recognition that the market structure in which they operate will most easily yield profits by means other than price competition."). If the Agreements inflated prices in a subset of the market by 15%, the market as a whole may have "deci[ded] to join [the] price increase" by "mirror[ing]" prices "to be on par" with the inflated price. *In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 763, 770, 780 (E.D. Pa. 2017). The Complaint indicates a similar dynamic here—top selling

prices jumped by 15% and prices in the market as a whole rose by the same amount. Compl. ¶¶ 79, 91.

Correcting for the district court's mistake, OJ Commerce's allegations are sufficient to establish actual anticompetitive effects in the artificial Christmas tree market as a whole. A 15% supra-competitive increase in price is sufficient to allege harm to competition. *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 285–86 (6th Cir. 2014) (Being "charged 7.9% more for milk" is "precisely the kind of injury that the Sherman Act was designed to prevent."); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 810 (7th Cir. 2012) ("In light of the FTC's findings that the merger had violated the law and enabled Northshore to raise its prices at least nine or ten percent above competitive prices, it is understandable that Northshore put up a determined opposition"); *United States v. Container Corp. of Am.*, 393 U.S. 333, 338 (1969) ("Price is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition.").

Plaintiff's allegation of a 15% market-wide price increase above the competitive level does not stand alone. It is reinforced by allegations throughout the complaint. OJ Commerce repeatedly emphasized the

harm to consumers resulting from the agreement, including "artificially inflated prices" for consumers and "suppress[ed] retail competition." *See* Compl. ¶¶ 54, 91; *see also id.* at 1–2, ¶¶ 42, 50, 51, 55–58, 74–75, 78–80, 93.

In *Jacobs v. Tempur-Pedic International, Inc.*, this Court affirmed the dismissal of a complaint that had only one conclusory allegation that the agreement "unreasonably restrain[ed] trade" with no detail as to "*how* harm to competition" resulted from the agreement at issue. 626 F.3d at 1340. There, the complaint simply stated that the Agreements at issue "have unreasonably restrained, do unreasonably restrain, and will continue to unreasonably restrain trade and commerce in the [relevant] market" by eliminating price competition. *Id.*

Unlike this conclusory allegation, the Complaint here alleges with specificity how the minimum margin and product restraint agreements harmed competition and resulted in market-wide supra-competitive prices. *See* Compl. ¶¶ 35, 54–55, 73, 78, 91. The Complaint explains that prices increased because the minimum margin and product restraint agreements fixed the supra-competitive price that Defendant charged to non-Amazon retailers and prevented those retailers from discounting. *Id.*

¶¶ 54–55, 73. Companies like OJ Commerce could not profitably sell goods below the price they bought them for at wholesale (which was fixed by the minimum margin agreement). And the product restraint agreements prevented them from undercutting Amazon's prices even if they could profitably do so. The Agreements eliminated price competition in the market and artificially inflated prices. *Id.*

The Complaint further explains that National Christmas Products enforced its agreements by hiring a company specifically to "monitor and punish online sellers" that violated these terms. *Id.* ¶¶ 53, 66–68, 90. These allegations are sufficient because they provide a "basis on which a court determines *how* harm to competition results from [the defendant's] agreements with its distributors." *Jacobs*, 626 F.3d at 1340; *Am. Express Co.*, 585 U.S. at 549 (noting that the Court will infer competitive injury when plaintiff provides some evidence proving prices were above a competitive level).

The allegations in *Spanish Broadcasting* are similarly inapplicable. The *Spanish Broadcasting* plaintiff did not allege that prices "actually r[ose]" or that the quantity of the product "actually decreased." 376 F.3d at 1078–79; *see also DeCurtis LLC v. Carnival Corp.*, 2021 WL 7539904,

at *25–26 (S.D. Fla. Feb. 9, 2021) (*Spanish Broadcasting* "only include[ed] two conclusory statements about anti-competitive effects" and "failed to even allege any increase (or potential increase in price or that output had decreased."). In fact, the *Spanish Broadcasting* plaintiff "admitted that consumer prices were *lower* than they might be absent the defendant's activities." *Lucasys, Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d. 1331, 1351 (N.D. Ga. 2021) (citing *Spanish Broad.*, 376 F.3d at 1074).

The Complaint's allegations of harm are highly specific. They are not "bald statements" or "conclusory allegations" of competitive harm, *Jacobs*, 626 F.3d at 1339; *Spanish Broad.*, 376 F.3d at 1079. OJ Commerce supported its allegations of harm to consumers and competition with a specific quantification of the price effects across the market. The Complaint alleges that OJ Commerce identified a market-wide supra-competitive price increase of fifteen percent in a specific period. Compl. ¶¶ 78, 91. No more is required at this early stage.

*ii. The allegation of inflated prices for top-selling products is also sufficient*

The district court also erred in discarding the allegation of a 15% price increase among top-selling products. Even if other artificial Christmas product prices remained stable while top-selling product

prices rose, the Complaint would still state a claim. If top-selling product prices moved independently of other product prices, top-selling artificial Christmas products would constitute *their own market*. The Complaint would then adequately allege harm in the top-selling product market.

A market is defined by the rate at which consumers would switch to substitute products based on price changes. *See, e.g.*, *PepsiCo, Inc. v. Coco-Cola Co.*, 315 F.3d 101, 105 (2d. Cir. 2002); *Jacobs*, 626 F.3d at 1338. A properly defined market exists when a group of products is sufficiently distinct that a price increase above competitive levels for those products would be profitable (because too few consumers would switch away in response). *See, e.g.*, *PepsiCo*, 315 F.3d at 105; *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). If a company controlling an entire group of products could profit by durably raising prices by 5% above the competitive level, those products would constitute a market. *See, e.g.*, *Fed. Trade Comm'n v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 fn.1 (3d Cir. 2016); *Fed. Trade Comm'n v. Wilh. Wilhelmsen Holding ASA,* 341 F. Supp. 3d 27, 46–47, 57 (D.D.C. 2018).

Top-selling products would be their own market if a monopolist could profitably increase prices for them by 5% (let alone 15%) above

competitive levels while other product prices stayed constant. *Id.* (explaining hypothetical monopolist—or "SSNIP"—test). More factfinding would, of course, be needed to delineate the exact contours of this market, prove that it contains a distinct set of products, and further show that anticompetitive conduct durably and profitably elevated prices. But the district court erred by cutting off this process before it began. It dismissed the complaint based on formalistic distinctions rather than considering economic realities. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992).

#### b. The allegations of a double-digit price increase are independently sufficient

The allegations of a double-digit price increase are sufficient to show consumer harm. Compl. ¶¶ 78–79. A plaintiff must make "specific allegations linking market power to harm to competition in that market." *Spanish Broad.*, 376 F.3d at 1073. But the complaint's "alleged facts need not be spelled out with exactitude." *Quality Foods*, 711 F.2d at 995 (citing *United States v. Employing Plasterers Ass'n of Chi.,* 347 U.S. 186, 188, 189 (1954)). A plaintiff need only provide "some" evidence that prices rose above a competitive level, particularly at the motion to dismiss stage. *Am. Express Co.*, 585 U.S. at 549 (this Court infers

competitive injury when "some evidence" shows prices rose above competitive levels); *Jacobs*, 626 F.3d at 1340. Antitrust does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) ("[T]here is no heightened pleading standard in antitrust cases.").

The allegations of a double-digit supra-competitive price increase market-wide are sufficient to plausibly allege actual anticompetitive effects. *See* Compl. ¶¶ 35, 78. The Complaint explains that OJ Commerce "calculated that in and after March 2020—after the product restraint agreements were entered into—the prices to consumers for artificial Christmas tree products in the Market substantially increased above competitive levels by double digits." *Id.* ¶ 78 (emphasis removed). The district court criticized this allegation of a double-digit price increase as "lack[ing] numerical specificity or any explanation of how Plaintiff arrived at such figures." MTD Order III at 18–19. Neither of these grounds is proper as a matter of law.

To start, the district court improperly discredited these allegations. *Spanish Broad.*, 376 F.3d at 1070. *Twombly* requires Courts take "as

true" a complaint's allegations. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). This is true even if the facts "are subject to dispute." *Diverse Power, Inc. v. City of LaGrange, Ga.*, 934 F.3d 1270, 1273 (11th Cir. 2019).

Taking OJ Commerce's allegations of a market-wide double digit price increase as true, the district court should have denied the motion to dismiss. *Any* price increase above the competitive level is sufficient. It follows that any double-digit increase above competitive levels would satisfy OJ Commerce's burden. Even if there were a 5% or 10% requirement (price increases courts use to anchor the hypothetical monopolist test), any double-digit increase would still meet that threshold—whether it be 11% or 99%. *Fed. Trade Comm'n v. Advocate Health Care Network,* 841 F.3d 460, 465 (7th Cir. 2016); *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 57 (D.D.C. 2011) ("practical price increase levels that trigger antitrust concern—the typical five to ten percent price increase"); *Copeland v. Energizer Holdings, Inc.*, 716 F.

Supp. 3d 749, 766 (N.D. Cal. 2024) (finding a complaint alleging a "10% increase across all products" sufficiently alleges harm to competition).

Further, alleging double digit price increases is sufficiently specific at this stage. *Wacker v. JP Morgan Chase & Co*, 678 F. App'x 27, 30–31 (2d Cir. 2017) (reversing order dismissing case where district court demanded specificity in amount of undue profits). Courts regularly find that plaintiffs plausibly allege actual anticompetitive harm without specifying the precise magnitude of the harm or methodology used. *See e.g.*, *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 340 (3d Cir. 2018) (accepting allegations of reduced output and higher prices without requiring quantified effects); *Lucasys*, 576 F. Supp. 3d at 1350–51 (accepting alleged quality reduction and increased prices without numerical specificity); *Zulily, LLC v. Amazon.com, Inc.*, 761 F. Supp. 3d 1368, 1387–89 (W.D. Wash. 2024) (holding that the complaint sufficiently alleged a consumer price increase even with no allegations of the quantity of the increase).

The district court cites no authority suggesting OJ Commerce needed to detail the methodology of its calculations in the Complaint. *Contra* MTD Order III at 18–19. Nor is OJ Commerce aware of any. To

the contrary, courts regularly accept alleged harms—like $20 million of artificially depressed salaries—without requiring any methodological disclosures. *Todd v. Exxon Corp.*, 275 F.3d 191, 214 (2d Cir. 2001). OJ Commerce will be required to produce expert economist formulae, work papers, and underlying datasets when it submits expert reports during discovery, but no such requirement exists at the pleading stage. Nor would that make sense when quantitative calculations are not required at all and discovery has not begun.

OJ Commerce's complaint does not rely on conclusory claims of harm. Rather, the complaint details *how* the alleged Agreements affected competition, provides sufficient specificity as to the *magnitude* of this effect, and even explains *why* Defendant entered into this agreement. *See* Compl. ¶¶ 35, 78, 91. Nothing more is required at this stage. *Vasquez v. Ind. Univ. Health, Inc.*, 40 F.4th 582, 586–87 (7th Cir. 2022) ("'a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations' . . . Indeed, the allegations do not even need to establish the probability of the plaintiff's recovery . . . They need only present 'enough fact to raise a reasonable expectation that discovery will reveal evidence' of illegal acts.") (cleaned up); *DeCurtis*, 2021 WL

7539904, at *26 ("[T]he FAC alleges that the anti-competitive effects are happening right now . . . And when these facts are coupled with all the other allegations, it is unclear what else should have been included to state an antitrust claim.").

The district court's approach is emblematic of its decision to hold plaintiffs to a "high threshold" akin to a summary judgment standard, contrary to this Court's clear precedent requiring an "exceedingly low threshold." *See* MTD Order III at 17; *Spanish Broad.*, 376 F.3d at 1070, 1078.

#### c. The Complaint properly alleges prices above competitive levels

To adequately plead that a practice is anticompetitive, a plaintiff alleging a price increase must show that the conduct raised "the prices of goods above competitive levels[.]" *Jacobs*, 626 F.3d at 1339. The competitive level for a price is the price "that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984). Any price exceeding that is, by definition, a price above the competitive level. That is often called a "supra-competitive price" or an "anticompetitive price." *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 984 (9th Cir. 2023). Prices are

driven above the competitive level by anticompetitive conduct that distorts the market. Even after full discovery, courts only require "some evidence" that tends to prove prices were above a competitive level. *Am. Express Co.*, 585 U.S. at 549 (citation omitted).

The district court held that OJ Commerce failed to plead that the price increases were above competitive levels. MTD Order III at 18 (citing *Leonard v. Ala. State Bd. of Pharmacy*, 591 F. Supp. 3d 1155, 1169 (M.D. Ala. 2022), *aff'd*, 61 F.4th 902 (11th Cir. 2023)). The district court held that "it is not at all clear that a 15% price increase in prices for top-selling products qualifies as a price increase 'above competitive levels.'" *Id.*

The district court's conclusion, however, appears to be driven by a narrow focus on a sliver of the Complaint. The district court's holding is ostensibly focused on the final clause of paragraph 79, which states "the top-selling artificial Christmas tree products throughout the Market increased by more than 15%." Compl. ¶ 79. The district court is right that this clause, viewed in extreme isolation, may not allege supra-competitive prices. But that conclusion cannot survive contact with the preceding clause, the preceding paragraph, or numerous other paragraphs in the complaint. *See, e.g.*, Compl. ¶¶ 79 ("the

*anticompetitive*" price increase); 78 ("substantially increased *above competitive levels*"); 86 ("the increase in retail prices of artificial Christmas tree products in the Market as a result of the illegal agreements showed the prices were above competitive levels"). The Complaint specifically alleges and justifies a supra-competitive price increase. *See id.* ¶¶ 78, 91. The Complaint does so in three ways: a qualitative analysis, a benchmark analysis, and an analysis of inflation and costs.

*i. Qualitative analysis*

Courts do not require sophisticated economic methodologies to be applied at the pleading stage. A "complaint need not . . . include an extensive economic analysis[.]" *MLW Media LLC v. World Wrestling Ent., Inc.*, 655 F. Supp. 3d 946, 951 (N.D. Cal. 2023) (citing *Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022); *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 20 (D.D.C. 2021)). This makes sense because discovery has not commenced. Plaintiffs often lack crucial data for sophisticated calculations. The Supreme Court admonishes that, even after full discovery, "the vagaries of the marketplace usually deny us sure knowledge of what" the market would have looked like "in the absence of

the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981). As a result, courts should "observe the practical limits of the burden of proof" on antitrust plaintiffs. *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 123 (1969). A Complaint is sufficient if it alleges that price increases are above the competitive level and provides a reasoned basis for that—such as an explanation of why the challenged conduct is expected to harm competition.

OJ Commerce provided that in spades. The Complaint alleges that because of the challenged conduct, prices were "above competitive levels," Compl. ¶ 86, "substantially increased above competitive levels," *id.* ¶ 78, and "resulted in supra-competitive, artificially inflated prices[.]" *Id.* ¶ 91. The Complaint shows that Defendant's "anticompetitive conduct alone drove these increases," rather than the normal competitive process. *Id.* ¶ 88. This is supported by analysis throughout the complaint explaining why National Christmas Products' vertical price fixing scheme would be expected to elevate prices anticompetitively.

OJ Commerce also alleged that it would have sold National Christmas Products' trees at a lower price had the manufacturer not

entered the Agreements with Amazon. *Id.* ¶ 72 ("[b]ecause of the [minimum margin] and product restraint agreements between Defendant[] and Amazon, [OJ Commerce] was cut off from selling Defendant['s] artificial Christmas tree products and from selling them at lower prices than allowed by the illegal contracts."). A price increase that is caused by anticompetitive conduct is—by definition—an elevation of price above competitive levels. OJ Commerce alleged that U.S. consumers were "forced to pay more for Defendant['s] artificial Christmas tree products than they would have if Defendant[] (and Amazon) had not unreasonably restrained competition in the price of artificial Christmas tree products subject to the illegal agreements." *Id.*; *see also id.* ¶ 95 ("Defendants' agreements also resulted in the elimination of price competition from discount retailers, such as OJC, who were more efficient than Amazon, and could offer to sell Defendants' artificial Christmas tree products to consumers for cheaper than Amazon.").

*ii. Benchmark analysis*

The most common approach to show supra-competitive prices is known as a benchmark analysis. *See, e.g.*, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788 (9th Cir. 2021),

*on reh'g en banc,* 31 F.4th 651 (9th Cir. 2022) (relying on benchmark periods before and after the alleged conspiracy period); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 520–21 (S.D.N.Y. 1996) (discussing various approved methodologies for proving the existence and measure of class damages). This analysis compares prices before anticompetitive conduct to prices after anticompetitive conduct. The before period is the "benchmark," offering an effective point of comparison because it is similar to the after period in many ways—it involves the same set of products and the same market. The main difference is the anticompetitive conduct. Price increases above the benchmark price that coincide with anticompetitive conduct can show the likely effect of that conduct.

OJ Commerce shows a price increase above competitive levels based on a benchmark analysis that examines prices before and after March 2020. Compl. ¶ 78; *E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 472 (E.D.N.Y. 2005), *aff'd sub nom.* 472 F.3d 23 (2d Cir. 2006) (extensive analysis not required, pleadings must merely "bear a rational relation to the methodology courts prescribe"). The Complaint explains that after March 2020, when National Christmas Products

entered the challenged Agreements, prices to consumers rose by double digits. Compl. ¶ 78. The Complaint confirms that National Christas Products' "illegal agreements with Amazon resulted in supra-competitive, artificially inflated prices for artificial Christmas tree products, as evidenced by a Market-wide price increase of over 15% after March 2020." *Id.* ¶ 91. The Complaint makes clear repeatedly that prices rose because of the challenged anticompetitive conduct. *Id.* ¶¶ 78–89 ("The price fixing increases were a direct result of [National Christmas Products' active enforcement of its MMA and product restraint agreements with Amazon."). This is supported by allegations that prices rose after the anticompetitive conduct took effect. *Id.* ¶¶ 89–91. These well-pleaded allegations far exceed what is required at this stage.

*iii. Prices compared to costs and inflation*

Another way to show that prices are supra-competitive is to demonstrate that prices are rising faster than inflation and input costs. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 805–10 (1946) (finding anticompetitive conduct when firms increased price absent a corresponding increase in costs); *McWane*, 783 F.3d at 839. That is exactly what OJ Commerce alleged in the Complaint.

OJ Commerce first compared price trends for artificial Christmas products against inflation. This put price increase allegations "in context," ruling out inflation as the reason for the price increase. *See id.* ¶¶ 84–88; *Levine*, 72 F.3d at 1552. OJ Commerce explained that "overall inflation initially declined when the pandemic began in 2020 and did not begin to surge until March 2021." *Id.* ¶ 85 (citation omitted). According to the Bureau of Labor Statistics, consumer good prices decreased 0.4% in 2020. *Id.* ¶ 88. Thus, artificial Christmas tree price increases that occurred during the relevant period were not the result of inflation. *See id.* ¶¶ 85, 88. Rather, "the increase in retail prices of artificial Christmas tree products in the Market [was] a result of the illegal agreements [and] showed the prices were above competitive levels, because as other consumer retail prices fell, the Market products rose." *Id.* ¶ 86.

OJ Commerce's analysis was also reinforced by an analysis of wholesale costs. OJ Commerce compared the price trends—showing that wholesale prices dropped across the market while prices for National Christmas Products' trees increased. *Id.* ¶¶ 83, 85. The complaint states that wholesale prices were unchanged during the relevant period. *Id.* ¶¶ 80–81, 88 (Because the pandemic had not yet caused prices to rise,

"wholesale costs to [National Christmas Products] didn't budge."). In Comparison, consumer prices for artificial Christmas trees rose. As a result, National Christmas Products "raked in bigger profit margins without spending an extra cent, a smoking gun that their anticompetitive conduct alone drove these increases." *Id.*

These detailed analyses reinforce the Complaint's well-pleaded allegations that price increases "resulted from Defendant's illegal agreements." *Id.* ¶ 80. Thus, the complaint rejects the possibility that National Christmas Products hiked prices in response to "general market factors" such as "increased expenses." *Id.* ¶ 81; *see also id.* ¶ 88. As this Court observed in *McWane*, rising prices and profits amidst stable costs is strong evidence of supra-competitive pricing. 783 F.3d at 839.

Accordingly, by ruling out other potential confounding factors and providing additional explanation and evidence, the complaint sets forth non-conclusory allegations that the harm to competition resulted from defendant's unlawful conduct. OJ Commerce has done far more than simply allege a naked price increase without any context. *See Jacobs*, 626 F.3d at 1339; *Levine*, 72 F.3d at 1552. By ruling out other "obvious alternative explanation[s]," OJ Commerce succeeded in plausibly

alleging supra-competitive pricing. *See Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 728–29 (11th Cir. 2020) (quoting *Twombly*, 550 U.S. at 567). Similarly, by including allegations on "non-defendant pricing, resource costs, [and] the rate of inflation," OJ Commerce established actual harm to competition via supra-competitive pricing. *Levine*, 72 F.3d at 1552.

Taking these allegations in the light most favorable to the plaintiff, the district court should have found these pleadings adequate. *Twombly*, 550 U.S. at 556. Even if the district court had found that multiple plausible inferences could be drawn, the court was required to choose the inference that favored OJ Commerce. *Hamilton v. Palm*, 621 F.3d 816, 819 (8th Cir. 2010) (deciding which "inference will prove to be correct is not an issue to be determined by a motion to dismiss.").

In support of its finding that OJ Commerce had failed to show that prices had risen above competitive levels, the district court cited *Leonard*, 591 F. Supp. 3d at 1169. MTD Order III at 18. There, the plaintiffs merely alleged that "[d]efendants *will* be able to charge consumers higher prices." *Leonard*, 591 F. Supp. 3d at 1169 (quoting *Jacobs*, 626 F.3d at 1339). There was nothing more—plaintiffs only alleged that such effects

might come to pass if they were forced out of the market. *See id.* But here, OJ Commerce has offered far more than the *Leonard* plaintiffs' "vague allegations, devoid of any detail." *Id.* OJ Commerce not only alleged a 15% price increase above competitive levels, it also supported this claim with evidence of inflation and wholesale prices to plausibly establish the competitive level that prices rose above. *See* Compl. ¶¶ 80–91. By ruling out other "obvious alternative explanation[s]," OJ Commerce succeeded in plausibly alleging supra-competitive pricing. *See Auto. Alignment*, 953 F.3d at 728–29 (quoting *Twombly*, 550 U.S. at 567).

#### d. OJ Commerce also adequately pleaded non-price harms to the market

A plaintiff may also show anticompetitive harm through a "reduction of output" or "deterioration in quality." *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1355 (11th Cir. 2024). OJ Commerce did so here. The district court further erred by ignoring numerous non-price harms to consumers. Compl. ¶ 75.

Beyond increasing retail prices, the Complaint alleges that National Christmas Products' Agreements "cut the consumer's buying options, cut service levels, strangled competition of retailers like [OJ Commerce] in favor of Amazon, and limited distribution." *Id.* The "limited

distribution" indicates that output was suppressed and the reduced "buying options" shows that consumer choice was constrained. *Id.* Either suffices.

The complaint also specifically alleges depressed quality because OJ Commerce and other smaller retailers that were locked out "provided services that Amazon did not provide." *Id.* ¶ 94. The anticompetitive Agreements were designed to, and succeeded in, "cut[ting] service levels" and "forestall[ing] innovation for [OJ Commerce] and other online retailers that could sell and provide the same quality of service to the consumer at a price well below the artificial minimum and distribution limitations set by Defendants." *Id.* ¶¶ 51, 75, 94, 118. It is unsurprising that smaller, more focused retailers would be able to provide better, more personalized service to consumers. *See United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 358 (1970); *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 191, 214 (D.D.C.), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (noting that specialty firms can both innovate and provide better services). Customer service and consumer choice "suffered" because of the anticompetitive Agreements. Compl. ¶ 120, 75.

By "point[ing] to the specific damage done to consumers in the relevant market," OJ Commerce adequately alleged harm to competition in general. *See Spanish Broad.*, 376 F.3d at 1072. OJ Commerce specifically alleged decreases in customer service because of the agreement, thus it plausibly alleged harm to competition. These allegations are sufficient at this stage. *See, e.g.*, *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 729–30 (W.D.N.C. 2017) (finding consumers being "denied access to consumer comparison shopping" constitutes "evidence of market harm"); *Cobb Theatres III, LLC v. AMC Ent. Holdings, Inc.*, 101 F. Supp. 3d 1319, 1335 (N.D. Ga. 2015) (holding that where a complaint alleges in detail how the defendants' conduct is reducing service quality, this plausibly suggests diminished quality). National Christmas Products may ultimately "be able to disprove [these] allegations regarding harm to competition after discovery, but, at the very least, this dispute cannot be resolved on a motion to dismiss." *Cobb Theatres III,* 101 F. Supp. 3d at 1335.

## III. OJ Commerce Sufficiently Pleaded Potential Competitive Harm

In addition to pleading actual harm, OJ Commerce also pleaded potential harm to the market. A plaintiff may allege anticompetitive

effects by showing that the challenged conduct potentially harmed competition. *Levine*, 72 F.3d at 1551. As noted above, to show potential harm, a plaintiff "must show [1] market power, [2] plus some other ground for believing that the challenged behavior could harm competition in the market[.]" *Spanish Broad.*, 376 F.3d at 1073 (quoting *Tops Mkts.*, 142 F.3d at 97). This "other ground" may include, but is not limited to, (i) "the inherent anticompetitive nature of the defendant's behavior or" (ii) "the structure of the interbrand market." *Id.* (quoting *Top Mkts.*, 142 F.3d at 97).

#### a. National Christmas Products has market power

Market power is the ability to profitably raise prices above competitive levels. *See, e.g.*, *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 444 (3d Cir. 2023). "The best test from which market power may be inferred is relative size, *i.e.*, the percentage of market share." *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir. 1988). Courts also look to barriers to entry and the market's structure. *McWane*, 783 F.3d at 830 (explaining that Courts often "examine market structure in search of circumstantial evidence of monopoly power.").

National Christmas Products' majority market share—coupled with barriers to entry and market's structure—support the conclusion that it has market power. OJ Commerce pleaded that National Christmas Products has *at least* a 50% market share. Compl. ¶ 44. The district court correctly assumed that this market share sufficiently alleges market power. MTD Order III at 18. *See e.g., United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365 (1963); *McGahee*, 858 F.2d at 1506; *Toys "R" Us, Inc. v. Fed. Trade Comm'n*, 221 F.3d 928 (7th Cir. 2000) (vertical agreements violated antitrust laws where toy retailer that sold 20% of all toys contracted with the two largest manufacturers accounting for 10 to 12% of the market); *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 385 (E.D. La. 2013) (quoting *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490–91 (5th Cir. 1984) (caselaw finds "33 percent market share" and other market factors suffice to threaten monopolization); *Valley Liquors, Inc. v. Renfield Imps., Ltd.,* 822 F.2d 656, 667 (7th Cir. 1987), *cert. denied,* 484 U.S. 977 (1987) (monopolization can be found with "17% and 25%" market share).

Even where a firm controls less than half the market, barriers to entry may still support a finding that a firm retains market power. *See,*

*e.g.*, *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 968 (10th Cir. 1990) (market shares generally do not "conclusively establish or eliminate market or monopoly power"); *Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64, 69 n. 7 (2d Cir. 1984) ("a party may have monopoly power in a particular market, even though its market share is less than 50%").

The barriers to entry in the artificial Christmas tree market also support National Christmas Products' market power. Barriers to entry "prevent new rivals from timely responding to an increase in price above the competitive level." *In re Pool Prods.*, 940 F. Supp. at 386–87 (citation omitted). OJ Commerce explained that several barriers to entry barred smaller companies from entering or expanding within the market. Compl. ¶¶ 44–48. These included: (a) the technical engineering needed to develop a line of artificial Christmas tree products that contained complicated electrical components that must be carefully designed to operate safely within consumers' homes, (b) extensive quality control testing and inspections, and thereafter obtaining regulatory approvals for use of the artificial Christmas tree products as consumer electronics products, and (c) significant amount of monetary expenditure in

marketing expenses to break into the Market that was dominated by Defendants, "the world wide leader in artificial Christmas Trees." *Id.* OJ Commerce further explained that National Christmas Products retained "unparalleled manufacturing capacity and vast product assortment," allowing them to "dictate market prices with impunity." *Id.* ¶ 46.

OJ Commerce also explained how barriers to entry "ensur[ed Defendant's] ability to dictate market prices with impunity." Compl. ¶¶ 45–47. This is the sine qua non of market power. National Christmas Products has, in its own words, been a "world wide" "leading importer and wholesaler" in the artificial tree market for "60 years." *Id.* ¶ 38. National Christmas Products held at least 50% share of the market, "with the balance of the Market distributed between a limited number of much smaller manufacturers." *Id.* ¶ 44. These factors demonstrate National Christmas Products' ability to dominate smaller competitors and exercise market power. *Id.* ¶ 45.

**b. The Agreements threatened competition**

The Complaint also alleges other grounds—in addition to market power—for believing that the challenged behavior could harm competition in the market. *Spanish Broad.*, 376 F.3d at 1073 (quoting

*Tops Mkts.,* 142 F.3d at 97). The Complaint offers substantive allegations about (i) "the inherent anticompetitive nature of the defendant's behavior" and (ii) "the structure of the interbrand market." *Id.* (quoting *Top Mkts.*, 142 F.3d at 97). Either is sufficient. The Complaint spells out in exhaustive detail how and why the challenged conduct drove prices above the competitive level.

*i. The nature of the Agreements was anticompetitive*

The Complaint explains that National Christmas Products' product restraint agreements with Amazon were anticompetitive, "eliminat[ing] intrabrand competition among retailers selling Defendants' artificial Christmas tree products[.]" Compl. ¶ 92. National Christmas Products' Agreements gave Amazon "exclusive access to discounts and certain of Defendants' products that no other retailers had[.]" *Id.* National Christmas Products thus gave Amazon the ability to control the pricing of other retailers, such as OJ Commerce. *Id.* Consequently, American consumers could not purchase less expensive options from other retailers, "because no retailers were allowed to sell [National Christmas Products' trees] for less than Amazon[.]" *Id.* ¶ 93.

The Supreme Court warned about exactly these types of agreements—vertical price agreements prompted by a retailer—in *Leegin Creative Leather Products v. PSKS, Inc.*, 551 U.S. 877, 894 (2007). The Court made clear that vertical agreements are subject to antitrust scrutiny under the rule of reason because the "consequences of vertical price restraints must not be ignored or underestimated." *Id.* It held that "a dominant manufacturer or retailer can abuse resale price maintenance for anticompetitive purposes" if "the relevant entity has market power." *Id.* at 898. Importantly for this appeal, "if there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint" is anticompetitive by propping up "a dominant, inefficient retailer." *Id.* at 897–98.

That is exactly the case here. The Complaint alleges that Amazon, as a retailer, developed the Agreements so they "could charge higher prices to consumers and make more profit." Compl. ¶¶ 55, 95. And National Christmas Products, the dominant manufacturer, signed these retailer-prompted Agreements. *Id.* ¶¶ 39–40, 50. The structure of the Agreements suggest that Amazon, as a retailer, was "the impetus" for them. *Leegin,* 551 U.S. 897–98. National Christmas Products had to pay

Amazon "whenever their Christmas products sell below the agreed floor price." Compl. ¶ 54.

Retailers like OJ Commerce could do nothing to combat these restrictions. National Christmas Products retained significant market power, "including the fact that no other competitor in the Market contained Defendants' second-to-none assortment of and distribution capacity for artificial Christmas tree products[.]" *Id.* ¶ 96. The Complaint explains that, when "coupled" with National Christmas Products' Agreements with Amazon, OJ Commerce did not have the option to conduct business with a competitor. *Id.* That is more than sufficient to show anticompetitive effects.

OJ Commerce has plausibly pleaded potential anticompetitive effects driven by the behavior warned of in *Leegin*, 551 U.S. at 896–98, and which, "as a matter of economic theory," are sufficient to state a claim. *See Epic Games*, 67 F.4th at 983–84 ("This inquiry need not always be extensive or highly technical. It is sufficient that the plaintiff prove the defendant's conduct, as matter of economic theory, harms competition.").

*ii. The market's structure made it vulnerable to anticompetitive harm*

OJ Commerce also plausibly pleaded that the structure of the market—with high barriers to entry, a dominant retailer and dominant manufacturer, and inelasticity of demand for the product—provided grounds for believing that the challenged behavior could harm competition. *See* Compl. ¶¶ 44–48; *see United States v. Visa, Inc.*, 2025 WL 1740613, at *18 (S.D.N.Y. June 23, 2025) (holding that, "the market's structure, and the [defendant's] dominant position in the market" plausibly pleaded that others were excluded from the market).

OJ Commerce alleged that the structure of the interbrand market is vulnerable to competitive harm. Here, OJ Commerce, did not "merely asssum[e], conclusorily, a pernicious monopoly capable of limiting output and raising prices[.]" *Spanish Broad.*, 376 F.3d at 1079 (dismissing a complaint that merely "contains several vague statements about the potential general consequences of hypothetical monopolization"); *see also CCBN.Com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146, 155 (D. Mass. 2003) (dismissing complaint that failed to allege power to control prices, power to exclude competition, competitors in the market, or market barriers to entry). Rather, the Complaint provided "specific

factual allegations" that National Christmas Products could, and in fact did, use its market power to harm competition. *Id.*; *see, e.g.*, Compl. ¶¶ 58, 61–66, 70, 72.

OJ Commerce specifically alleged that it could not obtain similar products to those sold by National Christmas Products from other manufacturers or distributors because of National Christmas Products' dominance in the market. Compl. ¶¶ 96, 111. This meant that OJ Commerce could not get similar products to sell at a lower price—forcing it to continue selling National Christmas Products' trees at a price artificially inflated by the manufacturer's conduct. *Id.*

The complaint also alleges that "[t]he combination of Defendants' market power within the [m]arket and Amazon's dominance in the overall online retail market only further" exacerbated these issues. *Id.* ¶¶ 35, 42, 48, 50, 53–57 These restraints on competition were intended to, and did, set a "de facto minimum retail price" market-wide that was artificially high. *Id.* ¶¶ 54–55, 61–68, 78, 91.

For example, the Complaint notes that, in "addition to Amazon's market share in online retail sales generally, Defendants were by far the largest market share-holder in the Market of artificial Christmas trees,

with Defendants possessing at least 50% share of the Market, with the balance of the Market distributed between a limited number of much smaller manufacturers." *Id.* ¶ 44. Defendant had maintained this dominance for 60 years. *Id.* ¶ 45. Courts have recognized that—in markets where there is one dominant manufacturer and several smaller manufacturers—several barriers can impede new firms from expanding their operations. *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) (explaining that, where other firms in the market are unable to expand their output to challenge the dominant firm's high price, this is indicative of market power); *United States v. Google LLC*, 778 F. Supp. 3d 797, 850 (E.D. Va. 2025) (finding that various technological barriers existed to restrict competitor expansion); *In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1304 (S.D. Fla. 2010) (recognizing barriers to expansion as barriers to entry, including start-up costs, supplies, and production expansion).

* * *

National Christmas Products engaged in a scheme that the Supreme Court warned of. The Complaint outlines the precise ways that the Agreements harmed competition—detailing the mechanism for

raising prices, the dimensions of the market that make it vulnerable, and alleging a quantitative analysis of anticompetitive effects using available data. These allegations are sufficient to state a claim.

## CONCLUSION

This Court should reverse the district court's grant of the motion to dismiss for failure to state a claim. At the least, reversal is appropriate on the grounds that dismissal with prejudice is improper. If this Court finds that the Complaint would state a claim if the allegations were explained more fully (e.g., disclosing the methodology behind price increase calculations), leave to amend would not be futile.

Dated: October 17, 2025

Respectfully submitted,

/s/ *Matt Summers*
Matt Summers
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, California 94111
(415) 906-1626 (*telephone*)

Shlomo Y. Hecht
SHLOMO Y. HECHT, PA
3076 North Commerce Parkway
Miramar, Florida 33025
(954) 861-0025 (*telephone*)

## CERTIFICATE OF COMPLIANCE

Eleventh Circuit Case Number: 25-11765

This document contains 12,132 words and complies with the word limit of Fed. R. App. P. 32, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word and is 14-point font.

/s/ *Matt Summers*
Matt Summers